NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0190n.06
Filed: March 10, 2009

No. 08-1454

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DOROTHY HENSMAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CITY OF RIVERVIEW, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |
| | ) | |

Before: CLAY and GIBBONS, Circuit Judges; and STAMP, District Judge.*

**JULIA SMITH GIBBONS, Circuit Judge**. Plaintiff Dorothy Hensman appeals the grant

of summary judgment to the City of Riverview ("Riverview") on her sexual harassment and hostile

work environment claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and

Michigan's Elliott-Larsen Civil Rights Act. The United States District Court for the Eastern District

of Michigan found that Hensman had failed to make a *prima facie* showing under either federal or

state law and entered judgment as a matter of law for Riverview. For the reasons set forth below,

we affirm the judgment of the district court.

---

* The Honorable Frederick P. Stamp, United States District Judge for the Northern District
of West Virginia, sitting by designation.

**I.**

This case arises out of interactions between Hensman and her supervisor, Fire Marshal/ Deputy Chief Richard Batchelder. Hensman worked for Riverview as a dispatcher for the Riverview Fire Department from 1995 until she took medical "stress leave" on November 3, 2005. Hensman worked for Batchelder for approximately six weeks, from the date he began as fire chief on September 19, 2005 to early November when she left the Fire Department. Hensman claims that Batchelder's actions during those six weeks constituted sexual harassment and created a sexually hostile work environment. Hensman acknowledges that Batchelder never sexually propositioned her and never groped or fondled her. Instead, Hensman alleges that Batchelder sexually harassed her by engaging in the following specific and general conduct.

Hensman describes four specific incidents as sexual harassment. First, on October 11, 2005, Hensman attempted to speak with Batchelder about his work. He allegedly claimed that he had not been listening because he was too distracted by how attractive she was. Second, he allegedly complimented her perfume multiple times, asked her what fragrance she was wearing, and continuously "sniffed" her. Third, Hensman claims that Batchelder described her as a "voluptuous," "well-endowed," woman on two occasions, one in the context of comparing her to his wife and mother-in-law. She testified that Batchelder said, "My wife didn't move here with me and you remind me of her, you are very strong and aggressive and – and very voluptuous." (Plaintiff's Dep. p. 59.) The fourth incident occurred on October 25, 2005 and was summarized by the district court as follows:

2

On that date, Batchelder had an evening meeting with the union president and, when he left the fire station to go to the meeting, he mistakenly locked his office, truck and apartment keys in the office. Since Plaintiff was the only other person who had an office key, he called her at home at approximately 11:30 p.m. and asked if she would come to the station and bring her office key so he could get in. Id. at 75; see also Batchelder Dep., pp. 81-82. Plaintiff told him she would not come to the station and that if he wanted the key he would have to come to her house and get it. [Plaintiff's Dep. pp. 75-76.] Batchelder did go to Plaintiff's house and Plaintiff, accompanied by her husband and daughter, answered the door wearing a bathrobe. Id. at 76. According to Plaintiff, Batchelder apologized for bothering her and her family and as she handed him the key, Batchelder commented, "You look cute in your jammies; I can see what you looked like as a little girl with your messy hair." Id. The next day, Batchelder came to the office and brought her a bouquet of flowers [and] bagels for breakfast and apologized again for bothering her the night before and for saying she looked cute in her jammies. Id. Plaintiff testified that she was "humiliated" because the firefighters thought it was funny that Batchelder had woken her up in the middle of the night. Id. at 77-79. "Everyone thought it was real funny." Id. at 79.

*Hensman v. City of Riverview*, No. 06-CV-14756-DT, 2008 WL 821940, at *3 (E.D. Mich. Mar. 26, 2008).

Hensman's complaint further alleges generally that Batchelder harassed her by closing the door when she was in his office and walking too closely behind her. Both of these practices made her feel uncomfortable. Additionally, Hensman claims that Batchelder harassed her by calling her the wrong name. Instead of using her nickname "Dodie," he sometimes referred to her as "Dorothy," (her full name), "Jodie," "Mrs. Henson," "Mrs. Hendman," and "Debbie."

Hensman's only physical allegations against Batchelder are that he hugged her on three occasions. The district court summarized the hugs as follows:

According to Plaintiff, the first time Batchelder hugged her was some time during the first two weeks of his employment. She testified that Batchelder "put his arms around [her]. . . and said, 'Thank you for helping me so much with the transition of starting a new job.'" [Plaintiff's Dep., pp. 16-17]. The second time was the beginning of the next week when Batchelder told her, "You're beautiful. I couldn't do this job without you, you are the backbone of this building. I can see you are a

3

very important part of the operation running smoothly and I'm very thankful to have you." [Plaintiff's Dep. p. 19.]

The third hug was a month later, the day before Plaintiff left her job. Plaintiff testified that on November 1, 2005, Batchelder called her into his office and said that he had sensed a tension between them. According to Plaintiff, Batchelder said, "I don't want you to be mad at me and I can tell something is up. I want you to tell me what's the matter" because "I want us to have a close working relationship, [like] a marriage, if you will." Id. at 82-83.

*Hensman*, 2008 WL 821940, at *2. Hensman testified that she then proceeded to tell him her frustrations, such as that he was "irritating," a "perfect example of someone with ADD," and that "it was very difficult for [her] to perform [her] job because he was constantly interrupting with compliments and personal statements about [her]." (Plaintiff's Dep. pp. 83-84.) Afterwards, Batchelder allegedly apologized and hugged her.

The following day, November 2, 2005, was Hensman's last day of work. Hensman was not feeling well and called the afternoon dispatcher to take over her shift. Batchelder then called her into his office and reprimanded her for the way she had spoken to him the previous day. He testified that he told her "she was unprofessional, out of line, and disrespectful," and "crossed over boundaries." (Batchelder Dep. pp. 93-94.)

According to Plaintiff, she responded saying, "I apologize, I am absolutely not a doctor and I do not know if you have ADD. However, I'm a mother and I know what it looks like." [Plaintiff's Dep., p. 90.] She then got up to go back to the dispatch radio and Batchelder followed her. Id. at 91; Batchelder Dep., p. 94. Batchelder ordered Plaintiff back into his office. Id.; Plaintiff's Dep., pp. 91-92. Once inside the office, before Batchelder could say anything, Plaintiff announced, "I've already called relief. I'm going home sick," and got up and left. Id. at 92; Batchelder Dep., p. 95.

*Hensman*, 2008 WL 821940, at *4. At this point, Hensman felt nauseous and had high blood pressure. Her replacement told her that Batchelder wanted her "out now," so she left the station.

4

(Plaintiff's Dep. p. 93.) Hensman testified that as she was exiting the building, Batchelder grabbed her arm so tightly that he left a mark and repeated her name over and over. Hensman allegedly told him to let go of her and walked to her car. Batchelder followed her and, "in a very angry, nasty tone," forbade her from returning to work until she contacted John Hajkus, the human resources director. *Id*. at 95.

The next day, Hensman contacted Hajkus, requesting a sick leave and the appropriate forms to file a harassment complaint. Seven weeks later, Hensman returned the "Employee Harassment Complaint Form." Hajkus investigated the nature of her complaint, interviewing Hensman, Batchelder, and other employees at the Riverview Fire Department. He concluded that there was no sexual harassment and sent Hensman a detailed report of his findings.

Hensman filed an EEOC complaint and procured a right to sue letter. She then filed a complaint against Batchelder and Riverview, alleging hostile work environment, assault, and battery. She subsequently removed the assault and battery allegations and added a sexual harassment claim under the Michigan Elliott-Larsen Civil Rights Act. Hensman also dismissed Batchelder as a defendant.

In response to Riverview's motion for summary judgment, the United States District Court for the Eastern District of Michigan found that Hensman had failed to make out a sexually hostile work environment claim under federal or state law and granted summary judgment to Riverview. Of all of Hensman's allegations, the court found that only Batchelder's comments referring to Hensman as "voluptuous," which Batchelder disputed occurring, were sexual. It further found that there were only four instances of physical contact, three hugs and the grabbing of Hensman's arm.

5

It found that these incidents were not severe or pervasive and thus did not warrant relief under federal or state anti-discrimination law. Hensman timely appealed to this court on March 29, 2008.

**II.**

The standard of review for a district court's grant of summary judgment is *de novo*. *See Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). Summary judgment should be granted when the moving party can show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the nonmoving party must demonstrate an essential element of its claim to defeat the motion for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the nonmoving party cannot provide enough evidence that a reasonable jury could find for it, the motion for summary judgment should be granted. *See Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

**A.**

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)). In order to establish a *prima facie* case of discrimination based on sex under Title VII, a plaintiff must show by a preponderance of the evidence that she meets the following five conditions:

6

(1) that she was a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability.

*Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). Conduct need not "seriously affect employees' psychological well-being" to be actionable under Title VII, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993), but it must be "severe or pervasive."[1] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998). The "conduct in question must be judged by both an objective and a subjective standard: [t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (alteration in original) (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)).

Hensman has failed to establish a *prima facie* case that she suffered from a hostile work environment due to Batchelder's sexual harassment. In sum, Hensman alleged that Batchelder 1) hugged her three times; 2) twice made comments to her about being "voluptuous"; 3) said he was not listening to her because he was distracted by her beauty; 4) walked too closely behind her; 5) closed the door when he met with her in his office; 6) told her she looked cute in her pajamas; 7)

---

[1] Hensman argues that the district court applied the wrong standard to her claim by requiring her to show that the conduct was "severe *and* pervasive," instead of "severe *or* pervasive." The district court did misstate the standard as "severe and pervasive" three times in its opinion. *Hensman*, 2008 WL 821940, at *10, 11, 13. The district court also stated the standard correctly as "severe or pervasive" in many instances in its opinion. *Id*. at 8, 9, 10, 11, 12. The district court's articulation of different standards in its opinion is indeed confusing; any error is nevertheless harmless because Hensman failed to present evidence of conduct that is either severe *or* pervasive for purposes of creating a hostile work environment.

brought her flowers and bagels to apologize for disturbing her the previous night; 8) complimented her perfume; 9) called her by the wrong name; and 10) grabbed her by the arm when she tried to leave. The district court held that Hensman met the first element of the standard, but failed to meet the second element; though Hensman is female, a member of a protected class, the district court found that the instances she reported were overwhelmingly nonsexual. The district court found that only the comments that Hensman was "voluptuous" qualified as sexual. Looking at the facts in the light most favorable to Hensman, as we must do in reviewing a motion for summary judgment, all of the allegations except for calling Hensman by the wrong name could be considered sexual. The district court thus erred in its characterization of much of Batchelder's conduct as nonsexual.

Even considering all of the allegations as sexual, however, Hensman has failed to show that the harassment she suffered created a hostile work environment. To determine whether sexual harassment created a hostile work environment, "the court must consider all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Thornton*, 530 F.3d at 455 (internal quotation marks omitted). The most disturbing instances Hensman reported, the comments about Hensman's voluptuousness and the unwanted physical contact, were not frequent. During the six weeks they worked together, Batchelder allegedly said Hensman was "voluptuous" twice, hugged her three times, and grabbed her arm once. While inappropriate, these instances were not frequent. *See Grace v. USCAR & Bartech Technical Serv., LLC*, 521 F.3d 655, 679 (6th Cir. 2008) ("[T]he occasional comments, which may have been 'offensive utterances,' do not rise to the level required by the Supreme Court's

8

definition of a hostile work environment. . . ."); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (finding that the plaintiff had not made a *prima facie* showing of hostile work environment when she "depict[ed] isolated instances rather than an ongoing situation"). Although the other actions Hensman reported allegedly occurred more frequently, such as Batchelder's complimenting her looks or perfume and closing the door during meetings, this conduct simply does not "permeate[]" the workplace with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks and citations omitted).

Similarly, the unwanted physical contact from Batchelder was inappropriate, but it does not rise to the level of "physically threatening or humiliating." Batchelder never propositioned Hensman or grabbed her sexually. *Compare Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (finding a *prima facie* showing of hostile work environment when male supervisor made continual, crass requests for oral sex, regularly rubbed against plaintiff with his private parts, and touched or grabbed her "every time" they worked together), *and Williams*, 187 F.3d at 563-64 (finding a *prima facie* showing of hostile work environment when plaintiff was subjected to continual, crude sexual propositions, derogatory remarks about women, and physical pranks, such as being hit by a thrown box and being locked in her work area), *with Clark*, 400 F.3d at 351 (finding no hostile work environment when male supervisor told vulgar jokes, twice pressed his vibrating pager against plaintiff's thigh, and once pulled at her overalls when she said she was wearing a thong), *and Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998) (table) (finding no hostile work

environment when male supervisor made continual sexual comments and touched plaintiff's breast once while removing a pen from her shirt pocket). Batchelder's conduct was offensive but "simply not substantial enough to satisfy the prima facie showing." *See Clark*, 400 F.3d at 352.

**B.**

Hensman also claims that Batchelder's actions violated the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"). The ELCRA prohibits discrimination on the basis of sex, which "includes sexual harassment."[2] Mich. Comp. Laws § 37.2103(i). In order to establish a claim under the ELCRA, plaintiffs must establish the same five elements required for a Title VII claim.[3] The

---

[2] The pertinent statutory text states:

Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:

(*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

(*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.

(*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

Mich. Comp. Laws § 37.2103(i).

[3] A plaintiff must show:

(1) the employee belonged to a protected group; (2) the employee was subjected to

10

evidentiary standards for Title VII and ELCRA claims are the same, *see In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007), except that the ELCRA requires a plaintiff to show that the harassing behavior is of a "sexual nature," not merely based on gender. Mich. Comp. Laws § 37.2103(i); *see Corley v. Detroit Bd. of Educ.*, 681 N.W.2d 342, 345 (Mich. 2004) (*per curiam*). Since Hensman has failed to establish the five elements necessary for a Title VII claim, she similarly has failed to make out a *prima facie* case of sexual harassment under the ELCRA. Because Hensman cannot show that Batchelder's actions created a hostile work environment, the district court did not err in granting summary judgment to Riverview.

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Riverview.

---

communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Downey v. Charlevoix County Bd. of County Road Comm'rs*, 576 N.W.2d 712, 716 (Mich. App. 1998); *see also Meyer v. Macomb Twp. of Macomb County, Mich.*, No. 06-14953, 2008 WL 2064551, at *7 (E.D. Mich. May 14, 2008).

**CLAY, Circuit Judge, dissenting.** Workplace discrimination cases like this one, in which the merits of the plaintiff's case largely depend on the credibility of the plaintiff and the alleged harasser, are best left for a jury. I would therefore reverse the district court's decision to grant Defendant summary judgment.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). "[T]his language is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotations and citations omitted). To establish a prima facie case of hostile work environment, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is liable. *Randolph v. Ohio Dept. of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (quotations and citations omitted). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

12

utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. "[T]he conduct underlying a sexual harassment claim need not be overtly sexual in nature. *Any unequal treatment of an employee that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (emphasis supplied). Moreover, "courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility." *Id.* at 563. As the Supreme Court stated, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81-82 (1998).

The majority opinion correctly cites the Supreme Court's "severe or pervasive" standard, noting that the district court erred to the extent that it required Hensman to prove both severity *and* pervasiveness. However, the majority then misapplies the standard when it states that because Hensman's assertions do not portray Batchelder's discrimination as either severe or pervasive, the district court's error was harmless. Majority Op. at 7 n.1. Viewing the facts in the light most favorable to Hensman, it seems clear that Batchelder's gender-based comments and actions toward her were pervasive enough to create an issue of fact with respect to whether a hostile work environment existed.

In *Clark v. United Parcel Service, Inc.*, 400 F.3d 341 (6th Cir. 2005), this Court, in finding that one of the plaintiffs was subject to a hostile work environment and the other was not, elaborated

13

on where to drawn the line between isolated episodes and conduct that is actionable because it is pervasive. In that case, a supervisor made two sexually vulgar remarks toward one employee, placed his vibrating pager on her thigh once as she passed her in the hall, and pulled on the back of her overalls when she told him she was wearing a thong; these four episodes, over a two-and-a-half year period, did not rise to an actionable level. *Id.* at 351. However, because the other plaintiff alleged seventeen episodes involving the same supervisor, including that he placed his vibrating pager between her legs and continually grabbed her hand, this Court found such behavior to be more of an "ongoing pattern of unwanted conduct and attention" that created a hostile working environment. *Id.* at 352.

Among other allegations, Hensman asserts that Batchelder (1) hugged her on three different occasions; (2) told her she looked "cute in her jammies" and then repeated that comment in front of other fire department personnel the next day, (Joint Appendix ("J.A.") at 357); (3) told her she was "voluptuous" and made a hand gesture to demonstrate, (J.A. at 353); (4) told her that she reminded him of his wife and that he was lonely because his wife did not currently live with him; (5) closed the door to his office while meeting with her more than once per day; (6) sniffed her and told her she smelled nice; (7) called her "beautiful" and told her "how attractive" she was, (J.A. at 343, 355-56); and (8) grabbed her arm as she was trying to get into her car after arguing with him. As the majority notes, all of these actions and comments could be considered "sexual" in nature, because none of them likely would have happened but for Hensman's gender. *See Williams*, 187 F.3d at 565.

Arguably, none of Batchelder's actions qualify as severe, but the sheer frequency of the incidents, which all took place over a span of less than two months, indicate enough of an "ongoing

14

pattern of unwanted conduct and attention" to survive summary judgment. *See Clark*, 400 F.3d at 351-52 (seventeen episodes over two-plus *years* pervasive enough); *Albeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251-52 (6th Cir. 1998) (sexually harassing comments, while not severe, were "commonplace," "ongoing," and "continuing," creating issue of fact with respect to hostile work environment claim). The majority identifies "the most disturbing instances" of Batchelder's conduct and finds that those instances were infrequent. Majority Op. at 8. However, the test is not whether the most egregious acts were frequent, but whether Batchelder's conduct, taken as a whole, was pervasive enough to constitute a pattern of gender-based behavior. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999) (cautioning that disaggregating claims of plaintiff alleging hostile work environment "robs the incidents of their cumulative effect").

In addition to the frequency of Batchelder's conduct, several other *Harris* factors are present in Hensman's assertions. First, Hensman asserted that Batchelder would tell her "nearly daily" that he "absolutely could not do any of this without [her]," and that he would call her into his office to talk to her privately more than once per day. (J.A. at 355.) Hensman asserts that those closed-door meetings were often the time in which Batchelder would tell her how attractive she was. A jury could find that such constant attention interfered with Hensman's ability to perform her job; Hensman even told Batchelder that she had trouble doing her job in part because of all of the "compliments and personal statements" he was making toward her. (J.A. at 359.) Second, Hensman asserts that when Batchelder told her, in front of her colleagues, that she had looked "cute in her jammies" the previous night, she was humiliated; whether it was reasonable to feel humiliated by such a comment may be a question for the jury, but in the context of all of the other episodes, a

15

reasonable juror could find the comment to be another factor causing an abusive environment. Third, although Batchelder's only action that could possibly be described as physically threatening–grabbing Hensman's hand outside of the fire station–may have been more of an attempt to stop her from leaving and calm her down than an effort to intimidate her, it is again difficult to make that determination when making all inferences in Hensman's favor.

Batchelder states that Hensman never asked him to leave his office door open when she was meeting with him, and that he had a policy of closing the door when any colleague was in his office. Batchelder also denies several of the comments Hensman attributes to him. However, this Court must favor Hensman's version of the events for the purpose of this motion. Certainly, the incidents Hensman asserts cannot be characterized as "isolated," and while most, if not all, of Batchelder's comments could be seen as the kind of "simple teasing [and] offhand comments" that are not actionable under Title VII, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), that determination should be left for the jury. For these reasons, I would reverse the district court's summary judgment order and remand the case for trial.[1]

---

[1]I would also reverse with respect to Hensman's state law claim, as a hostile work environment claim under the Elliot-Larsen Civil Rights Act requires demonstrating substantially the same five elements as under Title VII. *See Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993) (setting forth the five-element test for state hostile work environment claim).